119 T.C. No. 21


UNITED STATES TAX COURT


STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY AND SUBSIDIARIES,
Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 1859-01.                Filed December 19, 2002.


        P is an affiliated group of corporations filing a
consolidated Federal income tax return.  The group
comprises both life and nonlife insurance companies,
referred to as the life subgroup and the nonlife
subgroup, respectively.  P became subject to the
alternative minimum tax (AMT) for 1987 as a result of
events in 1989 generating a nonlife subgroup net
operating loss carryback from 1989 to 1987.  For
purposes of determining its AMT liability, P calculated
the book income adjustment on a consolidated basis.  R
maintains that the book income adjustment is to be made
on a subgroup basis, with a separate adjustment for
each subgroup.

        Held:  In the context of a life-nonlife consolidated
return, the AMT book income adjustment is to be made using a
consolidated approach, with a single adjustment for the
entire group.

Jerome B. Libin, James V. Heffernan, and Mary E. Monahan, for petitioner.

Jan E. Lamartine, for respondent.

OPINION

COHEN, Judge: Respondent determined a Federal income tax deficiency in the amount of $1,235,690 with respect to the 1987 taxable year of State Farm Mutual Automobile Insurance Co. and Subsidiaries (herein collectively petitioner). By answer, respondent asserted an increased deficiency of $2,827,110. The principal issue for decision is the computation of petitioner's alternative minimum tax (AMT) liability for 1987, which in turn will involve consideration of the amount of petitioner's alternative tax net operating loss (ATNOL) carryback from 1989. Integral to each of these calculations is the question of how properly, in the context of the consolidated return of an affiliated group of life and nonlife insurance companies, to take into account the alternative minimum tax book income adjustment of section 56(f).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for relevant years, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

All of the facts have been stipulated. The stipulated facts are incorporated as our findings by this reference.

### Petitioner's Organization and Operations

State Farm Mutual Automobile Insurance Co. (State Farm) is a mutual insurance company taxed as a corporation, the principal office of which at all relevant times was located in Bloomington, Illinois. State Farm is engaged in the business of providing property and casualty insurance. State Farm is also the common parent of an affiliated group including domestic life insurance companies taxed under section 801, domestic nonlife insurance companies, and other domestic corporations. Pursuant to an election under section 1504(c), the affiliated group filed consolidated Federal income tax returns for 1984 and for subsequent years, including 1986 through 1990.

### Petitioner's Accounting

For financial accounting purposes, State Farm files an annual statement with State insurance regulators on the form prescribed by the National Association of Insurance Commissioners (NAIC). This statement includes only the net book income of the parent company. Separate NAIC annual statements are required to be filed for each insurance company in the affiliated group in every State in which that company is licensed to do business. Companies in the affiliated group that are not regulated as

insurance companies also produce financial statements, which include book income that is not included in the financial statements of other group members.

For 1987, the total net book income attributable to life insurance companies of the affiliated group was $199,969,459 and that attributable to nonlife members was $2,392,675,741. For 1989, the total net book income attributable to life and to nonlife members was $231,216,351 and a loss of $40,044,428, respectively.

Petitioner's 1987 and 1989 Taxable Years

During the 1987 through 1989 period, the affiliated group comprised 2 first-tier life insurance company subsidiaries taxable under section 801 (which, for purposes of section 1503(c) and section 1.1502-47, Income Tax Regs., constituted the "life subgroup") and 11 other subsidiary corporations (which, for purposes of section 1503(c) and section 1.1502-47, Income Tax Regs., constituted the "nonlife subgroup").

When petitioner originally filed its 1987 consolidated Federal income tax return, it was not subject to the AMT imposed by section 55. Rather, petitioner ultimately became subject to the AMT for 1987 as a result of occurrences in 1989, namely, Hurricane Hugo, that adversely affected the property/casualty

insurance operations of the nonlife subgroup in that year and generated a nonlife subgroup net operating loss (NOL) carryback from 1989 to 1987.

For regular tax purposes, items relevant to petitioner's tax liability, before any NOL deduction, would include the following:

| Tax Item | 1987 | 1989 |
|---|---|---|
| Taxable income of nonlife subgroup | [1]$1,538,315,230 | [2]($691,736,003) |
| Partial taxable income of life subgroup | [3] 214,881,622 | [4] 261,624,770 |
| Amount subtracted under sec. 815 | 0 | 0 |

[1] An environmental tax deduction of $2,368,957 is taken into account in the figure stated. The parties agree that the precise amount of the deduction will depend upon the resolution of this case.

[2] An environmental tax deduction of $0 is taken into account in the figure stated.

[3] An environmental tax deduction of $259,030 is taken into account in the figure stated. The parties agree that the precise amount of the deduction will depend upon the resolution of this case.

[4] An environmental tax deduction of $313,560 is taken into account in the figure stated.

Under the regular tax regime, all of the 1989 nonlife subgroup net operating loss of $691,736,003 is required by section 1503(c) to be carried back to 1987 and cannot be used to offset 1989 life subgroup partial taxable income.

For AMT purposes, adjustments and preference items under sections 56, 57, and 58, excluding the book income adjustment and any ATNOL deduction, are as set forth below:

| AMT Adjustments and Preference Items | 1987 | 1989 |
|---|---|---|
| Nonlife subgroup | $18,508,088 | $70,327,213 |
| Life subgroup | 915,175 | 1,361,584 |

The parties have also stipulated that the ATNOL deduction for 1987, the total amount of which remains in dispute, will include ($189,367,790) attributable to a nonlife subgroup NOL carryover from 1986.

## Discussion

## I.  General Rules

### A.  Life-Nonlife Consolidated Returns

Prior to enactment of the Tax Reform Act of 1976 (TRA 1976), Pub. L. 94-455, sec. 1507, 90 Stat. 1739, nonlife insurance companies were prohibited from filing consolidated returns with life insurance companies.  See S. Conf. Rept. 94-1236, at 511 (1976), 1976-3 C.B. (Vol. 3) 807, 915.  The restrictions sought to ensure that life insurance companies, traditionally profitable, paid income tax commensurate with their investment income, undiminished by the losses of often unprofitable property and casualty companies.  Nichols v. United States, 260 F.3d 637, 642 (6th Cir. 2001); Conn. Gen. Life Ins. Co. v. Commissioner, 177 F.3d 136, 138 (3d Cir. 1999), affg. 109 T.C. 100 (1997). Economic considerations, however, led Congress to permit consolidation for years beginning after 1980 in order to "provide[] substantial relief in the future for casualty

companies with losses." S. Rept. 94-938 (Part 1), at 454-455 (1976), 1976-3 C.B. (Vol. 3) 49, 492-493; see also TRA 1976 sec. 1507(c), 90 Stat. 1740. At the same time, certain limitations were enacted to "preserve[] the concept sought by Congress in the past to the effect that some tax will be paid with respect to the life insurance company's investment income". S. Rept. 94-938, supra at 454, 1976-3 C.B. (Vol. 3) at 492.

In general, section 1501 grants to affiliated groups the privilege of filing consolidated returns, a privilege in which groups containing both life and nonlife members may share if an appropriate election is made under section 1504(c). Section 1503 then addresses the computation and payment of tax for purposes of such returns, providing in relevant part as follows:

SEC. 1503. COMPUTATION AND PAYMENT OF TAX.

(a) General Rule.--In any case in which a consolidated return is made or is required to be made, the tax shall be determined, computed, assessed, collected, and adjusted in accordance with the regulations under section 1502 [authorizing the Secretary to establish regulations regarding consolidated tax liability] prescribed before the last day prescribed by law for the filing of such return.

\* \* \* \* \* \* \*

(c) Special Rule For Application of Certain Losses Against Income of Insurance Companies Taxed Under Section 801.--

(1) In general.--If an election under section 1504(c)(2) is in effect for the taxable year and the consolidated taxable income of the members of the group not taxed under section 801 [applicable to life insurance companies] results in a

consolidated net operating loss for such taxable year, then under regulations prescribed by the Secretary, the amount of such loss which cannot be absorbed in the applicable carryback periods against the taxable income of such members not taxed under section 801 shall be taken into account in determining the consolidated taxable income of the affiliated group for such taxable year to the extent of 35 percent of such loss or 35 percent of the taxable income of the members taxed under section 801, whichever is less.  The unused portion of such loss shall be available as a carryover, subject to the same limitations (applicable to the sum of the loss for the carryover year and the loss (or losses) carried over to such year), in applicable carryover years.

Section 1.1502-47, Income Tax Regs., was promulgated to govern consolidated returns by life-nonlife groups.  The regulations generally adopt a "subgroup method" for determining consolidated taxable income.  Sec. 1.1502-47(a)(2)(i), Income Tax Regs.  This method divides the affiliated group into a life subgroup and a nonlife subgroup.  Id.; sec. 1.1502-47(d)(8) and (9), Income Tax Regs.  Consolidated taxable income for the group is then defined as the sum of:  (1) Nonlife consolidated taxable income, as set off by allowable life losses; (2) consolidated partial life insurance company taxable income (consolidated partial LICTI), as set off by allowable nonlife losses; and (3) amounts subtracted under section 815 from life policyholders' surplus accounts.  Sec. 1.1502-47(g), Income Tax Regs.

Nonlife consolidated taxable income, in turn, aggregates the separate taxable incomes of the nonlife members, with specified consolidated adjustments, and incorporates reductions for current

year nonlife consolidated NOL and for nonlife consolidated net operating and capital loss carrybacks and carryovers. Sec. 1.1502-47(h), Income Tax Regs.; see also secs. 1.1502-11, 1.1502-12, 1.1502-21A, 1.1502-22A, Income Tax Regs. Consolidated partial LICTI comprises the separate gross income and deductions of life members and is reduced by life loss carrybacks and carryovers from other years. Secs. 801-812, 818(e); sec. 1.1502-47(k) and (l), Income Tax Regs. Nonlife consolidated taxable income may then be set off by life losses and consolidated partial LICTI by nonlife losses in accordance with the rules set forth, respectively, in section 1.1502-47(n) and (m), Income Tax Regs. Limitations reflected in section 1.1502-47(m), Income Tax Regs., implement the mandate of section 1503(c).

The life-nonlife regulations additionally provide that other consolidated return principles apply unless preempted by inconsistent provisions in section 1.1502-47, Income Tax Regs. Sec. 1.1502-47(q), Income Tax Regs. ("The rules in this section preempt any inconsistent rules in other sections (sec. 1.1502-1 through sec. 1.1502-80) of the consolidated return regulations."); sec. 1.1502-47(r), Income Tax Regs. ("The fact that this section treats the life and nonlife members as separate groups in computing, respectively, consolidated partial LICTI (or

LO) and nonlife consolidated taxable income (or loss) does not affect the usual rules in secs. 1.1502-0--1.1502-80 unless this section provides otherwise.").

B. Alternative Minimum Tax

Section 55(a) imposes, in addition to any regular tax owed, an AMT equal to the excess of the tentative minimum tax over the regular tax for the taxable year. The tentative minimum tax for corporate taxpayers is 20 percent of the amount by which alternative minimum taxable income (AMTI) exceeds the applicable exemption amount, reduced by the AMT foreign tax credit. Sec. 55(b)(1)(B). AMTI, in turn, is defined as the taxpayer's taxable income for the year determined with the adjustments provided in sections 56 and 58 and increased by the tax preference items described in section 57. Sec. 55(b)(2).

As pertinent here, one of the adjustments provided in section 56 is the book income adjustment of section 56(f), as follows:

> SEC. 56(f). Adjustments for Book Income of Corporations.--
>
> (1) In general.--The alternative minimum taxable income of any corporation for any taxable year beginning in 1987, 1988, or 1989 shall be increased by 50 percent of the amount (if any) by which--
>
> (A) the adjusted net book income of the corporation, exceeds
>
> (B) the alternative minimum taxable income for the taxable year (determined

without regard to this subsection and the alternative tax net operating loss deduction).

(2) Adjusted net book income.--For purposes of this subsection--

(A) In general.--The term "adjusted net book income" means the net income or loss of the taxpayer set forth on the taxpayer's applicable financial statement, adjusted as provided in this paragraph.

\*    \*    \*    \*    \*    \*    \*

(C) Special rules for related corporations.--

(i) Consolidated returns.--If the taxpayer files a consolidated return for any taxable year, adjusted net book income for such taxable year shall take into account items on the taxpayer's applicable financial statement which are properly allocable to members of such group included on such return.

(Sec. 56(f) was enacted as part of the Tax Reform Act of 1986, Pub. L. 99-514, sec. 701(a), 100 Stat. 2320, and repealed by the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 11801(a)(3), 104 Stat. 1388.)

Additional rules pertaining to the book income adjustment in the context of consolidated returns are contained in regulations promulgated under section 56.  Section 1.56-1(a)(3), Income Tax Regs., specifies generally:

In the case of a taxpayer that is a consolidated group, the book income adjustment equals 50 percent of the amount, if any, by which its consolidated adjusted net book income (as defined in paragraph (b)(3)(i) of this section) exceeds its consolidated pre-adjustment

alternative minimum taxable income (as defined in paragraph (b)(3)(iii) of this section).  See paragraph (a)(4), Example (4) of this section. * * *

The referenced definition of consolidated adjusted net book income provides that the term means consolidated net book income after taking into account certain enumerated adjustments.  Sec. 1.56-1(b)(3)(i), Income Tax Regs.  Consolidated net book income, in turn, "is the income or loss of a consolidated group as reported on its applicable financial statement".  Sec. 1.56-1(b)(3)(ii), Income Tax Regs.  The applicable financial statement of a consolidated group "is the financial statement of the common parent" with the highest priority under ordering rules set forth in the regulatory section.  Sec. 1.56-1(c)(5)(i), Income Tax Regs.  Adjustments made to such financial statement include the addition of book income attributable to members of the consolidated group excluded from the applicable financial statement.  Sec. 1.56-1(d)(6)(i), Income Tax Regs. Consolidated preadjustment AMTI is explained as "the taxable income of the consolidated group", determined with the modifications prescribed in sections 56, 57, and 58 (except for the book income adjustment and the ATNOL).  Sec. 1.56-1(b)(3)(iii), Income Tax Regs.

Example (4) of section 1.56-1(a)(4), Income Tax Regs. (hereinafter Example 4), illustrates the foregoing principles as follows:

Corporations D and E are a consolidated group for tax purposes. D and E do not have a consolidated financial statement. On their separate financial statements D and E have adjusted net book income of $100 and $50 respectively, and preadjustment alternative minimum taxable income of $50 and $80 respectively. Assuming there are no intercompany transactions, DE's consolidated adjusted net book income * * * is $150 and its consolidated pre-adjustment alternative minimum taxable income * * * is $130. DE must increase its consolidated pre-adjustment alternative minimum taxable income by $10 (($150 - $130) x .50).

## II. Overview and Positions of the Parties

This controversy involves the intersection between the life-nonlife consolidated return rules and the AMT book income adjustment provisions. While each of the foregoing topics is the subject of a detailed and complex statutory and regulatory scheme, neither regime directly addresses how the two should be combined. By focusing on different aspects of the texts enacted or promulgated and their historical development, the parties here arrive at conflicting conclusions. To summarize the primary difference in their respective positions, petitioner maintains that the book income adjustment is to be computed on a "consolidated" basis, with a single adjustment for the entire group; respondent advocates a "subgroup" approach, with a separate book income adjustment for the life subgroup and for the nonlife subgroup.

Petitioner approaches the problem at hand by focusing principally on the specific language of the statute and regulations addressing the book income adjustment. Therein

petitioner finds support for a consolidated calculation of the adjustment.  Petitioner further supplements this emphasis with averments that such single-entity methodology is consistent with the preemption principles espoused in the life-nonlife consolidated return regulations, as well as with the historical development of the AMT regulations.

Respondent, in contrast, begins broadly with the expressed intent of Congress in enacting the AMT.  Respondent alleges that Congress manifested an intent to have the loss limitations of section 1503(c) apply in the AMT regime through observance of a parallel system.  Respondent therefore seeks to integrate the subgroup structure of the calculation directed in the life-nonlife consolidated return regulations into the AMT context.  In particular, respondent contends that, in view of the relationship between the book income adjustment and the ATNOL deduction revealed in section 56, the subgroup method is necessary to respect the section 1503(c) loss limits.

III.  Analysis

A.  General Implications of the Book Income Adjustment Provisions

As a general proposition, we agree with petitioner that the language employed in section 56(f) and attendant regulations reflects a consolidated approach to the book income adjustment. The statutory and regulatory provisions regarding the adjustment

to be made on consolidated returns are replete with singular references to "the taxpayer", "a taxpayer", "the book income adjustment", "its consolidated net book income", "its pre-adjustment alternative minimum taxable income", and so forth. E.g., sec. 56(f)(2)(C)(i); sec. 1.56-1(a)(3), Income Tax Regs. The items to be compared in calculating the adjustment, i.e., consolidated preadjustment AMTI and consolidated adjusted net book income, likewise are defined in terms that suggest a unified treatment.

Consolidated preadjustment AMTI is determined by starting with "the taxable income of the consolidated group for the taxable year". Sec. 1.56-1(b)(3)(iii), Income Tax Regs. This terminology implies the regular taxable income of the full consolidated group. Similarly, consolidated adjusted net book income is derived from the applicable financial statement of the common parent. Sec. 1.56-1(b)(3)(i) and (ii), and (c)(5)(i), Income Tax Regs. Again the language points to a single controlling document, and a subgroup approach could create an apparent conflict with this inference. Absent an entity standing in the relation of "common parent" to a particular subgroup, the subgroup methodology is not analogous to that directed in the regulations.

Moreover, Example 4 offers a numerical illustration in which the book income and preadjustment AMTI of D and E are compared on

a consolidated basis.  The result is an adjustment of $10.  As petitioner observes, if D and E were each treated as a subgroup of companies and a subgroup approach were employed, the consequent book income adjustment would be $25 ((($100 - $50) x .50) attributable to D + $0 (i.e., no adjustment) attributable to E).

The foregoing provisions therefore confirm that the book income adjustment for an affiliated group filing a consolidated return is generally to be computed on a consolidated basis.  The question thus becomes whether an exception to this rule applies in the case of a life-nonlife group.

B.  Application to Life-Nonlife Groups

Life-nonlife groups are distinct from other consolidated groups principally on account of being subject to the loss limits of section 1503(c).  Legislative history accompanying enactment of the AMT expressly indicates that Congress intended for the section 1503 limits to be observed in computing AMT liability, as follows:  "It is clarified that, in light of the parallel nature of the regular and minimum tax systems, any limitations applying for regular tax purposes to the use by a consolidated group of NOLs or current year loses (e.g., section 1503) apply for minimum tax purposes as well."  H. Conf. Rept. 99-841, at II-283 (1986), 1986-3 C.B. (Vol. 4) 1, 283.

We therefore must consider the relationship between the operating loss rules in the two tax systems and the book income adjustment. As described in section 56(f)(1), the book income adjustment equals 50 percent of the excess of adjusted net book income over AMTI determined without regard to the book income adjustment and the ATNOL deduction. Section 56(d), in turn, defines the ATNOL deduction as the NOL deduction determined for regular tax purposes under section 172 (i.e., NOL carryovers plus carrybacks), adjusted as provided in sections 56, 57, and 58, but not to exceed 90 percent of AMTI. The ATNOL deduction therefore incorporates, and will be preceded by calculation of, the book income adjustment of section 56(f).

Two principles thus emerge from the confluence of the organization and the underlying legislative history of section 56. First, the book income adjustment must be taken into account in computing the ATNOL arising in a given year and available for carrying to other years or the amount of AMTI available in a given year for absorbing amounts carried from other years. Second, the loss limits of section 1503(c) must be respected in calculating such ATNOL or AMTI. Neither party disputes these premises. They differ, however, as to whether actualization of these concepts demands resort to a subgroup approach for computing the book income adjustment.

Respondent contends that the above query must be answered in the affirmative. In so arguing, respondent relies on the characterization of ATNOLs by legislative history and caselaw as originating in a regime parallel to the regular tax system. Besides the passage previously quoted, the conference report describing the AMT legislation directs: "Minimum tax NOLs are carried over under a system separate from but parallel to that applying for regular tax purposes." H. Conf. Rept. 99-841, <u>supra</u> at II-282, 1986-3 C.B. (Vol. 4) at 282. Likewise, this Court in <u>Allen v. Commissioner</u>, 118 T.C. 1, 16-17 (2002), while rejecting the idea that the entire AMT construct paralleled the regular tax system, reiterated that "in the case of AMT NOLs, the rules for those NOLs did and still run parallel."

The parties in <u>Allen v. Commissioner</u>, <u>supra</u> at 6 n.4, used "parallel" in the AMT setting "to mean that the regimes run independently of each other without ever meeting", such that "a taxpayer must first apply the provisions of the Code to compute regular tax and then 'start from scratch' to apply those provisions to compute AMT." Respondent similarly contends that to actualize a parallel ATNOL regime here implies ascertaining how NOLs of life-nonlife groups are computed for regular tax purposes and applying that methodology within the context of the AMT provisions. More specifically, respondent maintains that, because the regulatory mechanism for implementing the loss limits

of section 1503(c) is to direct that items of income and deduction relevant to operating loss be determined on a subgroup basis, it follows that this framework should be maintained not only up to (as in petitioner's computations) but through (as in respondent's computations) calculation of the book income adjustment in order to arrive at separate ATNOL figures that parallel the separate loss amounts derived under the regular tax system.

The principal difficulty with this approach, however, is that it proposes to override the explicit language of the book income adjustment regulations in absence of any textual expression of preemption. While legislative history indicates that the loss limits of section 1503(c) are to apply for AMT purposes, no methodology for doing so was directly specified or mandated. Use by Congress of "parallel" in this context is not a compelling substitute for express rules.

As previously indicated, the life-nonlife consolidated return regulations contain several provisions addressing the interaction between those rules in section 1.1502-47, Income Tax Regs., and other consolidated return regulations promulgated under section 1502. Secs. 1.1502-47(a)(4), (q), (r), Income Tax Regs. The life-nonlife sections are expressly declared to preempt inconsistent rules in sections 1.1502-1 through 1.1502-80, Income Tax Regs. Sec. 1.1502-47(q), Income Tax Regs. In

other instances, separate computation of consolidated partial LICTI (or loss from operations) and nonlife consolidated taxable income (or loss) "does not affect the usual rules in secs. 1.1502-0--1.1502-80 unless this section provides otherwise." Sec. 1.1502-47(r), Income Tax Regs.

Hence, the preemption rules are by their terms limited to other regulations promulgated under section 1502 and have no direct applicability here. In this connection, it is noteworthy that the AMT regulations were promulgated after those for life-nonlife groups. Yet no provisions were put in place to specify unique treatment for these insurance entities, although the Commissioner had been made aware of the issue by a comment received after issuance of temporary AMT regulations. See Field Serv. Adv. Mem. TR-45-1815-95 (Apr. 10, 1996) (discussing events leading up to the issuance of the final AMT regulations). Nor were the explicit preemption directives in section 1.1502-47, Income Tax Regs., augmented to bear upon regulations other than those promulgated under section 1502. Given this scenario, we find merit in petitioner's analogy of the present situation generally to cases such as United Dominion Indus., Inc. v. United States, 532 U.S. 822 (2001), and Honeywell Inc. v. Commissioner, 87 T.C. 624 (1986).

In United Dominion Indus., Inc. v. United States, supra at 824-825, the Supreme Court held that a single-entity, rather than

a separate-member, approach should be used in computing product liability loss for purposes of section 172(j)(1). In that context, the Supreme Court stated:

> Thus, it is true, as the Government has argued, that "[t]he Internal Revenue Code vests ample authority in the Treasury to adopt consolidated return regulations to effect a binding resolution of the question presented in this case." * * * To the extent that the Government has exercised that authority, its actions point to the single-entity approach as the better answer. To the extent the Government disagrees, it may amend its regulations to provide for a different one. [Id. at 838.]

Honeywell Inc. v. Commissioner, supra at 631-633, involved the Commissioner's contention that certain depreciation regulations were not intended to cover the taxpayer's sales of leased computers to the respective lessees. We rejected as unpersuasive the Commissioner's reliance on caselaw "as establishing a 'concept' to override the express language of his regulations". Id. at 635. Petitioner draws the parallel that respondent should not be permitted to invoke the "concept" of the life-nonlife subgroup to defeat the language of the section 56(f) regulations. We agree that, notwithstanding various factual and substantive distinctions, these broad principles from United Dominion Indus., Inc. v. United States, supra, and Honeywell Inc. v. Commissioner, supra, ring true here.

While it may be said that the loss limits of section 1503(c) must be respected in calculating the AMT of a life-nonlife group, it does not follow that the explicit book income adjustment rules

must be rejected.  As petitioner emphasizes, appropriate allocation of the adjustment, where necessary, can accommodate these limitations in arriving at ATNOL or AMTI within the context of the otherwise mandated consolidated approach.

(Although it is unnecessary here to reach the mechanics of an appropriate allocation, we note that the idea of allocation of consolidated adjustments is not foreign to the consolidated return regime.  As regards the book income adjustment in particular, commentators have observed that allocation of the consolidated adjustment could be required in situations involving groups other than life-nonlife entities, such as where a member joins or departs from a consolidated group, and have suggested possible allocation methods.  See Sair & Axelrod, "Issues and Uncertainties in Consolidated AMT", 305 PLI/Tax 141, 166-168 (1990) (advancing two potential allocation strategies: Allocation based on each corporation's relative book income as compared to the total net book income and pro rata allocation based on book income adjustment amounts).  With respect to consolidated adjustments besides that for book income, certain regulations provide for allocation or attribution to particular group members.  For instance, petitioner cites sections 1.1502-21(b) and 1.1502-55(h)(4)(iii)(B)[1], Income Tax Regs., promulgated after the years relevant here, as prescribing rules for determining, respectively, the portion of a consolidated NOL

attributable to particular group members and the contribution of a member to a consolidated minimum tax credit limitation.)

C. Conclusion

To summarize, there exists both insufficient statutory or regulatory support for divergence from the consolidated approach reflected in the book income adjustment provisions and a reasonable means through allocation to accommodate the section 1503(c) limits without resort to a subgroup approach. In reaching this conclusion, we have considered all points raised by the parties and, to the extent not addressed herein, they are cumulative, irrelevant, or not appropriate for further discussion because not presented by the facts before us. Accordingly, we hold that, in the context of a life-nonlife consolidated return, the AMT book income adjustment is to be made using a consolidated approach, with a single adjustment for the entire group.

To reflect the foregoing,

Decision will be entered under Rule 155.